**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------ X
GLORIA ESCOBAR MALDONADO, on :
her own behalf and on behalf :
of EHE, her minor son, as his :
next friend, :
 :
                    Petitioners, :
 : No. 18 Civ. 3089 (JFK)
    -against- : **OPINION & ORDER**
 :
SCOTT LLOYD, Director, Office :
of Refugee Resettlement, :
et al., :
 :
                    Respondents. :
------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _05/04/2018_

APPEARANCES

FOR PETITIONERS GLORIA ESCOBAR MALDONADO and EHE
     Gregory P. Copeland
     Natalie E. Maust
     THE LEGAL AID SOCIETY

FOR RESPONDENTS SCOTT LLOYD, DIRECTOR, OFFICE OF REFUGEE
RESETTLEMENT, ET AL.
     Brandon M. Waterman
     Michael J. Byars
     UNITED STATES ATTORNEY'S OFFICE

**JOHN F. KEENAN, United States District Judge:**

    Before the Court is a habeas corpus petition (the

"Petition"), pursuant to 28 U.S.C. § 2241, brought by and on

behalf of EHE, a minor who is in the custody of the Office of

Refugee Resettlement ("ORR").  For just short of one year, EHE

has been separated from his mother and in the custody of ORR,

which is a division within the Department of Health and Human

Services ("HHS").  EHE and his mother, Gloria Escobar Maldonado
(together, the "Petitioners"), seek EHE's immediate release from
The Children's Village, an ORR facility located in Dobbs Ferry,
New York.  The Petition names Scott Lloyd (Director of ORR),
Jonathan White (Deputy Director of ORR), Steven Wagner (Acting
Assistant Secretary for the Administration for Children and
Families), Alex Azar (HHS Secretary), Elcy Valdez (ORR Federal
Field Specialist), and Jefferson B. Sessions, III (U.S. Attorney
General) as respondents (collectively, "Respondents").  For the
reasons stated below, the Court will grant the relief sought and
order EHE's immediate release into the care and custody of his
mother.

## I. Background

The Court makes the following findings of fact, which are
undisputed unless otherwise noted. See 28 U.S.C. § 2243 ("The
court shall summarily hear and determine the facts, and dispose
of the matter as law and justice require.").  The Court's
findings are based on the Petition and Petitioners' reply brief,
Respondents' opposition brief, sworn affidavits and documentary
evidence in support of the parties' respective positions, and
oral argument. See Birch v. Decker, 17-cv-6769 (KBF), 2018 WL
794618, at *2 n.1 (S.D.N.Y. Feb. 7, 2018) (on petition for
habeas corpus pursuant to § 2241, considering petition and
associated exhibits, respondents' brief in opposition, and

certain documents attached to respondents' return).  At oral argument, Petitioners' counsel agreed that the Court could consider all of the exhibits that have been submitted. (Tr. of Hr'g at 11, ECF No. 24 (filed May 2, 2018).)

### A. EHE's Arrest and Placement into ORR Custody[1]

EHE is 16 years old. (Pet. ¶ 2, ECF No. 11 (filed Apr. 11, 2018).)  Prior to being detained by ORR, EHE lived with his mother—Ms. Maldonado—and sisters in Brentwood, New York. (Id. ¶¶ 22-23.)  EHE began residing with Ms. Maldonado some time in 2015. (Maldonado Decl. ¶ 3, Pet. Ex. 1, ECF No. 11-1 (filed Apr. 11, 2018); Tr. of Hr'g at 2.)  EHE is a native and citizen of Honduras. (Resp'ts' Mem. in Opp'n at 7, ECF No. 16 (filed Apr. 12, 2018).)

On May 30, 2017, EHE and his friends were riding their bicycles in Brentwood when they were stopped by officers from the Suffolk County Police Department ("SCPD"). (Pet. ¶¶ 3, 37.)  EHE was handcuffed and taken into custody. (Id. ¶ 37.)  The arrest was purportedly effected pursuant to a Department of Homeland Security ("DHS") warrant dated May 30, 2017. (Resp'ts'

---

[1] The Court notes that Petitioners, in an effort to safeguard EHE's privacy, have filed substantially redacted versions of the Petition and their reply brief (and exhibits).  Given that Respondents' opposition brief and the oral argument transcript refer to many of the underlying details and information left out of Petitioners' public filings—and that both documents have been filed without redaction—the Court will file this Opinion without redaction.

Mem. in Opp'n at 7-8; Warrant of Arrest, Resp. to Pet. Ex. B, ECF No. 13-2 (filed Apr. 12, 2018).) The grounds for the DHS warrant have not been made clear, and EHE was not told the reason for his arrest. (Pet. ¶ 37; Tr. of Hr'g at 15-16, 25-26.) However, documents created upon EHE's arrest show that immigration authorities immediately portrayed him as a gang member, based on SCPD's vague and generalized observations.[2] EHE has not been charged with a criminal offense. (Pet. ¶¶ 37-38; Tr. of Hr'g at 14.)

The following day, EHE was transferred into the custody of Immigration and Customs Enforcement ("ICE") and taken to John F. Kennedy Airport, where he was allowed to speak to his mother by phone for the first time since his arrest. (Pet. ¶ 41.) Ms. Maldonado was informed that EHE was in ICE custody and was boarding a plane to the state of Washington. (Id. ¶ 42.) Upon his arrival in Washington, EHE was placed in ORR custody and

---

[2] For example, a May 30, 2017 memorandum prepared on ICE letterhead classifies EHE as a "likely MS-13 member" because: (1) he "has been identified as a likely member of MS-13 by [SCPD];" (2) his "clothing and accessories are indicative of membership in MS-13;" and (3) he "is regularly found associating with confirmed MS-13 gang members." (HSI Memo at 2, Pet. Ex. 17, ECF No. 11-17 (filed Apr. 11, 2018).) A DHS form, also dated May 30, 2017, repeats the same observations verbatim. (Form I-213 at 3-4, Resp. to Pet. Ex. A., ECF No. 13-1 (filed Apr. 12, 2018).)

admitted to the Selma R. Carson Home, a "staff-secure" facility.[3] (Id. ¶ 43.)  On June 8, 2017, EHE was transferred to Yolo County Juvenile Detention Facility, a "secure" facility, in Woodland, California. (Id. ¶ 44.)  After approximately sixty-four days, EHE was transferred to a "staff-secure" facility at The Children's Village. (Id. ¶¶ 45-46.)  On March 14, 2018, EHE was "stepped down" to a "shelter" facility at The Children's Village. (Id. ¶ 46.)

## B. The <u>Flores</u> Bond Hearing

Respondents contend that two determinations must be made before EHE may be released from ORR custody. (Resp'ts' Mem. in Opp'n at 1, 12-13.)  First, there must be a determination with regard to dangerousness, i.e., that EHE does not pose a danger to himself or others if released. (Id. at 1, 4.)  Second, there must be a determination that EHE's potential sponsor—i.e., his mother, the person to whom he would be released—is capable of providing for his physical and mental well-being. (Id. at 1, 6.) Respondents refer to the latter inquiry as the suitability determination, which rests with ORR. (Id. at 1, 6-7.)

With respect to the former inquiry, in the wake of the Ninth Circuit's decision in <u>Flores v. Sessions</u>, 862 F.3d 863

---

[3] ORR operates three types of facilities.  In descending order of the restrictions imposed on children in custody, the facilities are designated as:  secure, staff-secure, and shelter. (Resp'ts' Mem. in Opp'n at 4-5.)

(9th Cir. 2017), the dangerousness determination may be adjudicated by an immigration judge after a hearing. (Id. at 6-7; see also Tr. of Hr'g at 22 ("Following the Flores decision . . . we have a different process, where the dangerousness decision is made by the immigration courts and ORR is strictly determining suitability.").)  On March 13, 2018, EHE appeared before an immigration judge (the "IJ") for a Flores hearing. (Pet. ¶ 78.)  At the hearing, ORR proffered evidence, some of which was allegedly collected from EHE's cellphone, to support its position that he poses a danger. (Id. ¶ 76.)  At the conclusion of the hearing, the IJ found that EHE is "neither a danger to the community nor a flight risk." (Id. ¶ 78; EHE Flores Tr. at 54, Pet. Ex. 14, ECF No. 11-14 (filed Apr. 11, 2018).)

On March 16, 2018, ORR appealed the IJ's decision to the Board of Immigration Appeals ("BIA"). (Resp'ts' Mem. in Opp'n at 9.)  At the same time, ORR filed with the BIA a motion to stay the IJ's decision, which the BIA granted on March 20, 2018. (Id.)  On April 5, 2018, EHE moved for reconsideration of the stay order, which the BIA denied on April 19, 2018. (Id.; Letter from Michael J. Byars to Hon. John F. Keenan, ECF No. 23 (filed Apr. 20, 2018).)  With regard to ORR's appeal of the IJ's March 13, 2018 decision, the parties' briefs were due on May 2, 2018. (Tr. of Hr'g at 6.)  The Court has been informed that, on May 3,

2018, ORR requested an extension of time to submit its brief. (Letter from Gregory P. Copeland to Hon. John F. Keenan at 1-2, ECF No. 26 (filed May 4, 2018).)  There is no date for argument and no clear timeline for the BIA's decision. (Tr. of Hr'g at 6, 19-20.)

### C. Ms. Maldonado's Sponsorship Efforts

Ms. Maldonado indicated that she wanted to reunify with EHE when ORR contacted her on June 1, 2017, and EHE indicated that he wanted to reunify with Ms. Maldonado approximately one week later. (Pet. ¶¶ 79, 82; see also Michael Lonoff Mentions at 2, Pet. Ex. 19, ECF No. 11-19 (filed Apr. 11, 2018) (ORR notes dated June 1 stating "Mother wants to reunify [with] her son but is asking for help, she will be providing minor's BC this weekend.").)  On June 5, 2017, Ms. Maldonado received a family reunification pack ("FRP"). (Pet. ¶ 81.)  On July 13, 2017, Ms. Maldonado submitted an FRP by fax to Yolo County Juvenile Detention Facility, where EHE was then being held. (See Tr. of Hr'g at 10; see also Yolo Cty CM Notes at 2, Pet'rs' Reply Ex. 3, ECF No. 19-3 (filed Apr. 16, 2018) (ORR notes indicating receipt of "FRP via fax").)

A home study at Ms. Maldonado's residence was conducted on July 21, 2017, resulting in a report (the "First Home Study Report") on August 2, 2017. (Pet. ¶¶ 83-85.)  The First Home Study Report recommended against releasing EHE to his mother.

(Id. ¶ 85; see also Valdez Decl. ¶ 13, ECF No. 15 (filed Apr.
12, 2018).)  In their papers, Respondents cite several incidents
in connection with the negative recommendation, however they
identify no definitive reason for the negative recommendation.
One such incident is from September 2017, i.e., after completion
of the First Home Study Report. (Resp'ts' Mem. in Opp'n at 10;
Valdez Decl. ¶ 13.)  The First Home Study Report also evidently
indicated that Ms. Maldonado did not want to reunify with EHE.[4]
(Pet. ¶ 84.)

Ms. Maldonado restarted the sponsorship process in November
2017. (Valdez Decl. ¶ 14.)  After another home study was
conducted in January 2018, a second report (the "Second Home
Study Report") was completed on January 24, 2018. (Pet. ¶ 87.)
The Second Home Study Report included a positive recommendation
regarding EHE's release to Ms. Maldonado and noted that she
"shows that she is able to provide [EHE] with a safe and stable
home environment and demonstrates willingness to seek assistance
through community services." (January 2018 Homestudy at 23, Pet.
Ex. 24, ECF No. 11-24 (filed Apr. 11, 2018).)

A third home study was conducted on March 15, 2018, after
which ORR told Ms. Maldonado that another report had to be

---

[4] The proposition that Ms. Maldonado did not wish to reunify with
EHE appears to be incompatible with her submission of the FRP on
July 13, 2017 and is belied by her subsequent actions, including
initiating this habeas proceeding.

prepared. (Pet. ¶ 89.) Additionally, ORR explained that "it would take at least a month before anything would be done" with respect to her application. (Id. ¶ 91.) As of April 5, 2018, ORR had not submitted the application, citing a technical issue with the online portal used for submitting applications. (Id. ¶ 92; Emails with ORR at 1, Pet. Ex. 23, ECF No. 11-23 (filed Apr. 11, 2018).)

On April 11, 2018, the "care provider"—which the Court presumes to be The Children's Village—recommended against releasing EHE to his mother. (Valdez Decl. ¶ 16.) No explanation for the negative recommendation has been supplied to Ms. Maldonado or the Court. ORR maintains that a final determination regarding EHE's release to Ms. Maldonado remains pending. (Resp'ts' Mem. in Opp'n at 10; Valdez Decl. ¶ 16.) At oral argument, Respondents' counsel suggested that the suitability determination "hopefully" could be reached "by the end of next month," i.e., May 2018. (Tr. of Hr'g at 20, 32.)

The Court also notes that in February 2017—approximately four months before EHE was arrested—ORR determined that Ms. Maldonado was a suitable sponsor for EHE's teenage sister. (See Letter from Gregory P. Copeland to Hon. John F. Keenan at 1, ECF No. 21 (filed Apr. 18, 2018) (indicating that EHE's sister was released into the mother's custody on February 5, 2017); see also Letter from Brandon M. Waterman to Hon. John F. Keenan at

1, ECF No. 22 (filed Apr. 19, 2018) (same).) The Second Home Study Report, dated January 24, 2018, indicated that Ms. Maldonado's daughter was "observed to be content, well-groomed, and well cared for overall. She reports that she has everything she needs and is well cared for by" Ms. Maldonado. (January 2018 Homestudy at 10.)

### D. Procedural History

Petitioners filed the Petition under seal on April 6, 2018, and filed a heavily redacted version of the Petition on April 11, 2018. On April 18, 2018, the Court heard oral argument, at which Respondents provided the Court with a copy of ORR's brief to the BIA opposing EHE's motion for reconsideration of the BIA's order staying the IJ's decision of March 13, 2018.

## II. Discussion

### A. Subject Matter Jurisdiction

Respondents do not challenge whether this Court has subject matter jurisdiction over the Petition and the Court concludes that it does. Ms. Maldonado has "next friend" standing to bring this action under § 2241 because EHE is a minor and his mother is dedicated to act in his best interests. See Ross ex rel. Dunham v. Lantz, 408 F.3d 121, 123 (2d Cir. 2005) ("First, a 'next friend' must provide an adequate explanation . . . why the real party in interest cannot appear on his own behalf to prosecute the action. Second, the 'next friend' must be truly

dedicated to the best interests of the person on whose behalf he seeks to litigate[.]" (quoting Whitmore v. Arkansas, 495 U.S. 149, 163 (1990))).  When the Petition was filed, EHE was in ORR custody and detained in The Children's Village in Dobbs Ferry, New York, which is within this Court's jurisdiction in the Southern District of New York. See 28 U.S.C. § 112(b). Additionally, Ms. Maldonado has been trying to reunify with her son since at least November 2017 and asserts that EHE's detention violates his constitutional rights.  Accordingly, the Court has jurisdiction over the Petition.

### B. Statutory and Regulatory Framework

#### 1. The Homeland Security Act and the Trafficking Victims Protection Reauthorization Act

In 2002, Congress enacted the Homeland Security Act (the "HSA"), 6 U.S.C. § 279.  The HSA "transferred a number of the functions relating to the care of unaccompanied minors from the former INS to the Director of [ORR] of the Department of Health and Human Services." Flores, 862 F.3d at 870.  As relevant here, the HSA sets forth the definition of "unaccompanied alien child" ("UAC").  Under § 279(g)(2), a UAC is a child who:

> (A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom—(i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody.

The HSA makes ORR responsible for "making placement determinations for all [UACs] who are in Federal custody by reason of their immigration status." 6 U.S.C. § 279(b)(1)(C). In making such determinations, ORR is directed to ensure that UACs are not placed in a setting where they are "likely to pose a danger to themselves or others." Id. § 279(b)(2)(A)(iii). UACs may not be released upon their own recognizance. Id. § 279(b)(2)(B).

In 2008, Congress enacted the Trafficking Victims Protection Reauthorization Act (the "TVPRA"), 8 U.S.C. § 1232. The TVPRA incorporates the HSA's definition of "unaccompanied alien child" by reference, 8 U.S.C. § 1232(g), and many of its provisions are addressed to UACs. The TVPRA directs that "the care and custody of all [UACs], including responsibility for their detention, where appropriate, shall be the responsibility of the Secretary" of HHS. Id. § 1232(b)(1). Furthermore, "any department or agency of the Federal Government that has an unaccompanied alien child in custody shall transfer the custody of such child to [HHS] not later than 72 hours after determining that such child is an unaccompanied alien child." Id. § 1232(b)(3).

Once a UAC is in custody, HHS shall "promptly" place the UAC "in the least restrictive setting that is in the best interest of the child." Id. § 1232(c)(2). Whether the UAC poses

12

a "danger to self," "danger to the community," or "risk of flight" may be considered. Id. HHS "may not" place a UAC "with a person or entity" until it has made "a determination that the proposed custodian is capable of providing for the child's physical and mental well-being." Id. § 1232(c)(3)(A); see also id. § 1232(c)(3)(B) (requiring, in some instances, that a home study be conducted before a UAC is placed with an individual).

## 2. ORR Policies

As the Court has noted previously, ORR must make two determinations before releasing a UAC into the custody of a sponsor: (1) a dangerousness determination, and (2) a suitability determination. Here, in light of ORR's appeal of the IJ's determination that EHE did not pose a danger, the BIA will render the final decision on the question of dangerousness. (Tr. of Hr'g at 30.) Even if the BIA upholds the IJ's determination that EHE is not dangerous, however, ORR will not release EHE until a suitable sponsor has been determined. (Resp'ts' Mem. in Opp'n at 14.)

In assessing suitability, ORR must make "a determination that the proposed custodian is capable of providing for the child's physical and mental well-being." 8 U.S.C. § 1232(c)(3)(A). Under ORR policy,[5] a potential sponsor must

---

[5] ORR's policies are available at
https://www.acf.hhs.gov/orr/resource/children-entering-the-

submit an application, provide identification documentation, and undergo a background check. (Resp'ts' Mem. in Opp'n at 6 (citing ORR policy guide published online).  Once the assessment of the potential sponsor is complete, the care provider makes a release recommendation, followed by ORR's final release decision. (Id.) Additionally, for UACs in secure or staff-secure facilities, or for UACs who have been in such facilities previously, the final release decision is elevated to the ORR Director. (Id.)  In making the final release decision, the ORR Director can consider "anything that was before the agency." (Tr. of Hr'g at 29-30.)

### C. ORR Lacks Authority to Detain EHE Because He Is Not an "Unaccompanied Alien Child"

Before reaching Petitioners' due process arguments, the Court will analyze the HSA and TVPRA, which make ORR responsible for the custody and placement of UACs.  Petitioners do not challenge EHE's classification as a UAC. (See Tr. of Hr'g at 8.) However, the Court is bound to consider the applicable statutory text. See Camreta v. Greene, 563 U.S. 692, 705 (2011) ("[A] longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them." (internal quotation marks

---

united-states-unaccompanied (last visited May 4, 2018).  "These policies . . . are not promulgated through any formal agency rule-making process and do not appear to have any binding effect." Flores, 862 F.3d at 871.

omitted)). In so doing, the Court concludes that EHE is not a UAC, and therefore ORR is without authority to detain him.

As noted above, the HSA defines a UAC as a child who:

> (A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom—(i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody.

6 U.S.C. § 279(g)(2). The TVPRA incorporates the HSA's definition of UAC by reference. See 8 U.S.C. § 1232(g). Given the conjunctive phrasing of § 279(g)(2), an individual satisfies the statutory definition of a UAC only if each of the three prongs—(A), (B), and (C)—are met.

Here, prong (A) appears to be met because EHE does not challenge Respondents' assertion that he is without lawful immigration status. (See Resp'ts' Mem. in Opp'n at 1.) Likewise, prong (B) is met because it is uncontested that EHE has yet to attain eighteen years of age. (See Tr. of Hr'g at 24.) However, with respect to prong (C), Ms. Maldonado—who is indisputably EHE's "parent or legal guardian"—is in the United States. See 6 U.S.C. § 279(g)(2)(C)(i). Thus, EHE is "unaccompanied" only if "no parent or legal guardian in the United States is available to provide care and physical custody." Id. § 279(g)(2)(C)(ii).

Analyzing the ordinary meaning of the text of §
279(g)(2)(C)(ii), the Court concludes that Ms. Maldonado is
"available to provide care and physical custody" and, therefore,
EHE is not properly classified as a UAC. "Statutory
construction must begin with the language employed by Congress
and the assumption that the ordinary meaning of that language
accurately expresses the legislative purpose." United States v.
Kozeny, 541 F.3d 166, 171 (2d Cir. 2008) (internal quotation
marks omitted). In this endeavor, the Court is guided by Judge
Floyd's well-reasoned dissent in D.B. v. Cardall, 826 F.3d 721,
744-52 (4th Cir. 2016). As Judge Floyd observed, both parts of
§ 279(g)(2)(C) concentrate on a parent's physical presence "in
the United States," and § 279(g)(2)(C)(ii) deploys the word
"available." Cardall, 826 F.3d at 747 (Floyd, J., dissenting).
The selection of this specific language leads to the conclusion
that "in drafting the statute, Congress was concerned with
whether a child was accompanied in the sense of having a parent
in the territory of the United States, and not accompanied in
the sense of having a parent holding the child's hand at all
times." Id. Accordingly, a child is not "unaccompanied"-and,
therefore, neither a UAC nor properly within ORR's regulatory
ambit-if a parent is physically present in the United States

and, as a practical matter,[6] is available to provide care and physical custody.

The Court's interpretation is consonant with the customary circumstances giving rise to ORR custody. (See Tr. of Hr'g at 8-9 (Petitioners' counsel stating that "typically unaccompanied alien children are children that are crossing the border and not children, in our client's position, that were living with their mother at the time that they were taken into ICE and then ORR custody.").) Moreover, it is consistent with Respondents' own understanding of the applicable statutes and the scope of ORR's authority. Respondents acknowledge that when EHE attains eighteen years of age—i.e., when he ceases to be a "child" in the UAC formulation—he will "no longer be subject to ORR custody and they would release him."[7] (Id. at 24.) The same logic applies to a child who is not "unaccompanied" because a parent in the United States is available to provide care and physical

---

[6] A parent might be physically present in the United States and yet not "available to provide care and physical custody" when, for example, the parent "refuses to make herself available to take custody of a child" or is "incarcerated or otherwise in custodial detention." Cardall, 826 F.3d at 747 (Floyd, J., dissenting). No such situation applies in this case.

[7] ORR evidently took the same position in a separate, previous litigation. See Cardall, 826 F.3d at 749 n.3 (Floyd, J., dissent) ("[ORR] appears to concede that its authority ends once an individual ceases to be an 'unaccompanied alien child.' It recognizes that its authority ends once R.M.B. 'turns eighteen.'").

custody. Finally, such an interpretation comports with the significant procedural safeguards that traditionally accompany attempts by the Government to intervene in the relationship between a parent and child. See, e.g., Stanley v. Illinois, 405 U.S. 645, 658 (1972) (holding that "parents are constitutionally entitled to a hearing on their fitness before their children are removed from their custody").

Here, the record belies the proposition that EHE is "unaccompanied" in a statutorily relevant sense. At the time he was arrested, EHE was residing with his mother in Brentwood, New York. (Pet. ¶ 22.) There is no contention that Ms. Maldonado was in any way not "available to provide care and physical custody" at that time, nor have Respondents argued that she subsequently became unavailable. Moreover, since at least November 2017, Ms. Maldonado has unambiguously communicated her desire to reunite with EHE. (See Resp'ts' Mem. in Opp'n at 10 (acknowledging that Ms. Maldonado "agreed to restart the sponsorship process" in November 2017).) Accordingly, the Court concludes that the statutory term "UAC" does not apply to EHE.

Respondents repeatedly claim that ORR cannot release EHE before final determinations on dangerousness and suitability have been rendered. (See id. at 12-13, 15, 19.) This refrain presupposes that EHE is a UAC. However, no provision of the HSA or TVPRA appears to empower ORR to detain a child who, like EHE,

is not a UAC.  Without statutory power, ORR has no authority over EHE.  See City of New York v. Permanent Mission of India to United Nations, 618 F.3d 172, 187 (2d Cir. 2010) ("But 'an agency literally has no power to act . . . unless and until Congress confers power upon it.'" (quoting La. Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 374 (1986))).  Accordingly, EHE must be released.

### D. ORR's Detention of EHE Violates His Right to Procedural Due Process

Were the Court to conclude that ORR possessed statutory authority with respect to EHE, it nevertheless would agree with Petitioners that EHE's continued detention and separation from his mother violates his right to procedural due process under the Fifth Amendment.  "The Due Process Clause 'imposes constraints on governmental decisions which deprive individuals of "liberty" or "property" interests within the meaning' of the Fifth Amendment." Barrows v. Burwell, 777 F.3d 106, 113 (2d Cir. 2015) (quoting Mathews v. Eldridge, 424 U.S. 319, 332 (1976)).  The Due Process Clause "applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." Zavydas v. Davis, 533 U.S. 678, 693 (2001).

In evaluating alleged violations of procedural due process arising under the Fifth Amendment, the Second Circuit has

employed the balancing test set forth by the Supreme Court in

Mathews v. Eldridge, 424 U.S. 319 (1976). See Weinstein v.

Albright, 261 F.3d 127, 136 n.8 (2d Cir. 2001). Under the

Mathews framework, a court must consider:

> First, the private interest that will be affected
> by the official action; second, the risk of an
> erroneous deprivation of such interest through
> the procedures used, and the probable value, if
> any, of additional or substitute procedural
> safeguards; and finally, the Government's
> interest, including the function involved and the
> fiscal and administrative burdens that the
> additional or substitute procedural requirement
> would entail.

424 U.S. at 335.

With respect to the first Mathews factor, the Second

Circuit has long recognized the private interest affected here.

The "right to the preservation of family integrity encompasses

the reciprocal rights of both parent and children." Duchesne v.

Sugarman, 566 F.2d 817, 825 (2d Cir. 1977). Children have a

"constitutionally protected liberty interest in not being

dislocated from the emotional attachments that derive from the

intimacy of daily family association." Kia P. v. McIntyre, 235

F.3d 749, 759 (2d Cir. 2000) (internal quotation marks and

alteration omitted)); see also Southerland v. City of New York,

680 F.3d 127, 142 (2d Cir. 2012) (parents "have a

constitutionally protected liberty interest in the care, custody

and management of their children" (quoting Tenenbaum v.

20

Williams, 193 F.3d 581, 593 (2d Cir. 1999))). Here, EHE and his mother have been separated for more than eleven months. There is no doubt that Respondents' actions have "encroached" upon EHE's right to family integrity "considerably." See Beltran v. Cardall, 222 F. Supp. 3d 476, 482 (E.D. Va. 2016).

With respect to the second Mathews factor, it is appropriate to review the process that has been provided to Petitioners so far. The Court will consider the process provided to Ms. Maldonado despite the fact that, insofar as she asserts claims solely on her own behalf, she may not be a proper petitioner under § 2241.[8] Other courts evaluating similar petitions brought by a parent on behalf of a minor have analyzed the process provided to the parent. See Santos v. Smith, 260 F. Supp. 3d 598, 607, 611-14 (W.D. Va. 2017); Beltran, 222 F. Supp. 3d at 482-88. Here, the Court likewise concludes that such a course is proper in light of the "reciprocal rights" possessed by parent and child. See Duchesne, 566 F.2d at 825.

---

[8] As the caption indicates, Ms. Maldonado brings claims on behalf of EHE as his "next friend" as well as due process claims on her own behalf. Based on the action's styling ("Petition for Writ of Habeas Corpus"), the fact of EHE's detention, and the primary relief sought (i.e., EHE's release), the Court treats the claims presented here as a habeas petition pursuant to § 2241. "[A] general requirement of a § 2241 petition is that the petitioner be in custody." Santos v. Smith, 260 F. Supp. 3d 598, 607 (W.D. Va. 2017). Petitioners, however, have not argued that Ms. Maldonado is in custody.

EHE has been in ORR custody since May 31, 2017.  On July 13, 2017, Ms. Maldonado submitted an FRP, indicating her desire to reunite with EHE. (Tr. of Hr'g at 10.)  A home study was conducted in July 2017 and the First Home Study Report was completed on August 2, 2017. (Pet. ¶¶ 83, 85.)  The First Home Study Report recommended against releasing EHE to his mother.

Having made no apparent progress toward reunification with her son, Ms. Maldonado restarted the sponsorship process in November 2017. (Valdez Decl. ¶ 14.)  A second home study was conducted in January 2018, resulting in the Second Home Study Report on January 24, 2018. (Pet. ¶ 87.)  The Second Home Study Report recommended that EHE be released to Ms. Maldonado. (January 28 Homestudy at 23.)

On March 13, 2018, a Flores hearing was held in immigration court. (Pet. ¶ 78.)  At the conclusion of the hearing, the IJ determined that EHE was "neither a danger to the community nor a flight risk." (EHE Flores Tr. at 54.)  ORR then applied for (and obtained) a stay of the IJ's decision and filed an appeal with the BIA, which, as of the date of this Opinion, remains pending with no definite timeline for a decision.

Following a third home study conducted on March 15, 2018, ORR told Ms. Maldonado that another report had to be prepared and that a determination regarding her application would be further delayed. (Pet. ¶¶ 89, 91.)  As of April 5, 2018, ORR had

yet to submit the application due to technical problems. (Id. ¶ 92.)

Respondents have informed the Court that, on April 11, 2018, the "care provider" recommended against releasing EHE to Ms. Maldonado. (Valdez Decl. ¶ 16.) As Petitioners' counsel stated at oral argument, Ms. Maldonado learned of this negative recommendation only by virtue of this litigation and received no written notice from ORR. (See Tr. of Hr'g at 9, 35.) No explanation for the negative recommendation-and, thus, no grounds to challenge it—has been supplied to Ms. Maldonado or the Court. (Id.) ORR maintains that a final determination regarding EHE's release to his mother remains pending, but has not explained what role the care provider's negative recommendation will play in that determination or what other information, if any, will be considered in making the final determination.

In sum, the record reveals that, over the course of more than eleven months, EHE has received a hearing in immigration court on the question of his dangerousness, and Ms. Maldonado has been afforded the opportunity to submit an application requesting that her child be released to her and the opportunity to participate in several home studies for the purpose of evaluating her suitability as a sponsor for EHE. As several other courts have found, this process displays several

significant deficiencies, especially in view of the magnitude of the private interest at stake. See Santos, 260 F. Supp. 3d at 611-15; Beltran, 222 F. Supp. 3d at 482-89.

As an initial matter, Respondents have not made adequate disclosures to Ms. Maldonado about ORR's decision-making. Respondents attempt to connect several incidents to the First Home Study Report's negative recommendation, but none is offered as the actual foundation for the negative recommendation. (See Resp'ts' Mem. in Opp'n at 10; Valdez Decl. ¶ 13.) One such incident occurred on September 7, 2017 and, therefore, could not have supported the negative recommendation issued on August 2, 2017. Additionally, after advising Ms. Maldonado that her application would be further delayed in March 2018, Respondents failed to provide her with clear information about the status of her application and what, if anything, must be done to finalize it. (See Pet. ¶¶ 89-92.) Finally, Respondents failed to provide Ms. Maldonado with notice of the care provider's April 11, 2018 negative recommendation or any supporting rationale. But for the instant proceeding, there is no indication that Ms. Maldonado would have learned of this latest negative recommendation, which contradicts—without any stated reason—the positive recommendation made on January 24, 2018. These "opaque" procedures have deprived Ms. Maldonado of "any opportunity to contest ORR's findings, and thus any meaningful

opportunity to alter its conclusions." Beltran, 222 F. Supp. 3d
at 485.

Additionally, ORR's suitability determination has been
inordinately and inexplicably delayed.  EHE has been in ORR
custody for more than eleven months, and Ms. Maldonado first
submitted an FRP indicating her desire to reunify with EHE nine
months ago, in July 2017.  Even measuring from November 2017,
when Ms. Maldonado restarted the sponsorship process, six months
have now passed.  Yet ORR still has not rendered a final
decision regarding her suitability as a sponsor for EHE, nor has
it offered any explanation for this delay.

ORR's delay is even more troubling in light of its February
5, 2017 determination that Ms. Maldonado is a suitable sponsor
for EHE's teenage sister. (See Letter from Gregory P. Copeland
to Hon. John F. Keenan at 1.)  ORR determined that Ms. Maldonado
was a suitable sponsor for EHE's sister just four months before
EHE was arrested and transferred into ORR custody.  As recently
as January 24, 2018, ORR found that EHE's sister was "content,
well-groomed, and well cared for overall," and reported that
"she has everything she needs and is well cared for by" Ms.
Maldonado. (January 2018 Homestudy at 10.)  When given an
opportunity to identify any changed circumstances that might
support a different conclusion with respect to Ms. Maldonado's

suitability to sponsor EHE, Respondents failed to do so.[9] (See
Letter from Brandon M. Waterman to Hon. John F. Keenan at 1-2
(stating that "ORR conducts a new suitability analysis for each
potential release" but offering no new information bearing on
Ms. Maldonado's suitability).)  In light of these facts, ORR's
prior determination as to Ms. Maldonado's suitability belies the
proposition that she may not be a suitable sponsor for EHE.

Finally, other courts have found that when a parent (rather
than another relative or a friend) seeks reunification with her
child, ORR procedures improperly place the burden of proof on
the parent to demonstrate suitability rather than on ORR to
justify its continued custody of the child. See Santos, 260 F.
Supp. 3d at 613 ("[W]hen a parent is requesting reunification,
the burden should be on ORR to show why its continued custody of
a UAC is appropriate, rather than placing that burden on the
parent."); Beltran, 222 F. Supp. 3d at 485 (finding process
inadequate because "[a]t no point was the onus on ORR to justify
its deprivation of Petitioner's fundamental parental rights").
In this case, the Court agrees that ORR's procedures improperly

---

[9] To whatever extent ORR relies on the "sensitive information"
contained in its brief in the pending BIA proceeding, (Tr. of
Hr'g at 20-21), that document—which the Court has reviewed—does
not describe otherwise undisclosed behavior on the part of
either EHE or Ms. Maldonado.  Therefore, it does not reflect any
change of circumstance that bears directly on Ms. Maldonado's
suitability as a sponsor for EHE.

place the burden on Ms. Maldonado, especially in light of the uncontested fact that EHE was living with her prior to his arrest.

To summarize, "the deficient procedures employed by ORR created a significant risk" that EHE "would be erroneously deprived of [his] right to family integrity." Beltran, 222 F. Supp. 3d at 488. "This risk could have been mitigated by additional procedural safeguards," including enhanced transparency regarding ORR's decision-making, an expedited suitability determination, and adjusting the burden of proof to account for the important private interest at stake. Id. Accordingly, Respondents "must demonstrate that an extraordinarily compelling interest justified ORR's failure" to provide additional or substitute procedures. Id.

Turning to the third Mathews factor, Respondents have not explicitly named the Government interest to be weighed against EHE's private interest. The most obvious Government interests here are protecting the welfare of children and the safety of the public. See Saravia v. Sessions, 280 F. Supp. 3d 1168, 1199-1200 (N.D. Cal. 2017) (in case involving detention of UACs previously released to sponsors, recognizing the Government's asserted interests in "public safety and welfare, including the welfare of the minor"), appeal docketed, No. 18-15114 (9th Cir. Jan. 23, 2018); see also Gottlieb v. County of Orange, 84 F.3d

27

511, 518 (2d Cir. 1996) ("Where . . . there is an objectively
reasonable basis for believing that parental custody constitutes
a threat to the child's health or safety, government officials
may remove a child from his or her parents' custody at least
pending investigation.").

As in Santos, Respondents here fail to "identif[y] what
burden it would impose on ORR to provide more process to [EHE]
(or children like him) and parents who seek reunification with
their children." 260 F. Supp. 3d at 615 (emphasis in original).
Nor have Respondents indicated the number of children currently
in ORR custody who, like EHE, are detained over the objection of
an available parent.  Thus, the Court cannot determine "the
burden on ORR of, for example, holding hearings, making more
expeditious decisions, etc." Id.  Whatever burden additional or
substitute procedures might impose, however, "is not sufficient
to overcome the first two factors of the Mathews test in this
instance." Beltran, 222 F. Supp. 3d at 489.

Separate from the Mathews analysis, a related due process
concern is that, in the Court's view, the circumstances
surrounding EHE's arrest are circumspect.  Respondents have
provided the Court with a DHS warrant dated May 30, 2017, the
same day EHE was arrested. (See Warrant of Arrest at 2.)  The
warrant does not state the grounds for EHE's arrest, and
Respondents have not articulated the grounds. (See id.; see also

Tr. of Hr'g at 15-16.)  At the time of EHE's arrest, it appears
that the only evidence of his involvement with any gang is
SCPD's self-serving observations that his "[c]lothing and
accessories are indicative of membership in MS-13" and that he
was "[r]egularly found associating with confirmed MS-13 gang
members." (HSI Memo at 2; Form I-213 at 3-4.)  In and of
themselves, EHE's choices of wardrobe and associates do not
constitute criminal offenses, and EHE has not been charged with
one. (See Tr. of Hr'g at 14.)  The complete absence of hard
evidence of EHE's affiliation with MS-13 or any other gang
generates the inference that EHE's arrest was merely a pretext
for placing him in detention.  Moreover, EHE has never been
convicted of any crime nor ever before been arrested. (See Form
I-213 at 3.)

Respondents argue that the Court should require Petitioners
to exhaust their administrative remedies.  However, they concede
that exhaustion is not a statutory requirement here and,
moreover, that one exception to a judicially imposed exhaustion
requirement arises when "a plaintiff has raised a substantial
constitutional question." (Resp'ts' Mem. in Opp'n at 13-14
(quoting Beharry v. Ashcroft, 329 F.3d 51, 62 (2d Cir. 2003)).)
As explained above, Petitioners have raised a substantial
constitutional question related to EHE's rights under the Fifth
Amendment.  Therefore, the Court will not require exhaustion.

Accordingly, the Court concludes that EHE's right to procedural due process has been violated.

## E. Remedy

Petitioners challenge EHE's detention and seek his immediate release to Ms. Maldonado. Federal courts have "broad discretion in conditioning a judgment granting habeas relief." Hilton v. Brandskill, 481 U.S. 770, 775 (1987). Other courts, confronting similar petitions and requests for relief, have ordered the immediate release of a child from ORR detention into the care and custody of a parent. See Santos, 260 F. Supp. 3d at 615-16; Beltran, 222 F. Supp. 3d at 488-89. Like Santos and Beltran, this case implicates the right to family integrity. See Santos, 260 F. Supp. 3d at 615-66; Beltran, 222 F. Supp. 3d at 489-90; see also Duchesne, 566 F.2d at 825 ("Th[e] right to the preservation of family integrity encompasses the reciprocal rights of both parent and children."). Likewise, EHE has already been separated from his mother for many months—nearly one year—and his reunification with his mother continues to be delayed for an unknown period of time.

Although this case shares significant points of overlap with Santos and Beltran, it also presents several unique features that further support EHE's immediate release. Here, before being arrested and transported to a facility across the country, EHE was living with his mother. Cf. Santos, 260 F.

Supp. 3d at 601 (child entered the United States alone and "was apprehended almost immediately"); Beltran, 222 F. Supp. 3d at 480 (child was arrested by U.S. Customs and Border Protection agents "near the Mexican border"). Furthermore, as the Court has explained, there is good reason to question the basis for EHE's arrest in the first instance. Accordingly, the Court concludes that EHE's immediate release into Ms. Maldonado's care and custody is appropriate, in lieu of mandating additional process.

The Court finds that no additional relief is warranted.

### Conclusion

For the reasons above, the Petition is GRANTED as to Count 1. Counts 2 and 3 of the Petition are DENIED as moot. Respondents shall immediately release EHE to the care and custody of his mother, Gloria Escobar Maldonado.

The Clerk of Court is respectfully directed to close this case and remove it from the docket of this Court.

**SO ORDERED.**

Dated:    New York, New York
          May 4 , 2018

_John F. Keenan_
John F. Keenan
United States District Judge